## WILLIAM P. TUTTLE, Respondent, v. LOUISE J. TUTTLE, Appellant.

'(181 N. W. 888.)

**Divorce — decree for husband will not be vacated twelve years afterwards where during that time wife has received benefits thereof.**

This is an appeal from an order made by Judge Cooley denying a motion to vacate a judgment of divorce. In 1907, some thirteen years ago, the plaintiff being fifty-nine and the defendant sixty-three, this action was commenced. From the complaint and the answer it appears that each party charged the other with cruelty and desertion. On the trial each party was represented by distinguished counsel. Many witnesses were sworn. The testimony covers 500 pages, and it sustains the judgment. The moving affidavits, which impute bribery to the trial judge, are in no way convincing. And it appears that for twelve years the defendant has accepted the benefits of the judgment; she has been receiving $300 a month. In 1909 an appeal from the judgment was dismissed because the plaintiff had then accepted some of the benefits awarded her. Tuttle v. Tuttle, 19 N. D. 748.

Opinion filed October 28, 1920. Rehearing denied January 21, 1921.

Appeal from an order of the District Court of Burleigh County, Honorable *Chas. M. Cooley,* Special Judge.

Affirmed.

*Leslie A. Simpson* and *S. E. Ellsworth,* for appellant.

It is well settled that judgments may be set aside and vacated on motion made in the original action, and such has been the practice generally in such cases. Beach v. Beach, 6 Dak. 371, 40 N. W. 701; Gaar, S. & Co. v. Spaulding, 2 N. D. 420; Yorke v. Yorke, 3 N. D.

343, 55 N. W. 1095; Nichells v. Nichells, 5 N. D. 125, 64 N. W. 73.

Fraud, as other facts, may be established by a preponderance of the evidence. While a preponderance of evidence is required to sustain the burden of proof, a preponderance is sufficient, and proof beyond a reasonable doubt is not necessary." 20 Cyc. 121, notes 15, 16; 17 Cyc. 760, 761.

A proceeding or action in equity to cancel a contract implied by fraud is governed by the same principles which apply to a similar action to vacate a decree. 20 Cyc. 87, 91; Dennie v. Harris (Iowa) 153 N. W. 343; Haverty v. Haverty (Kan.) 11 Pac. 364.

"A court record, based upon a legal fraud, may demand obedience while it stands, but it is idle to talk of the sanctity of such a record. Whatsoever is tainted with fraud—a court record no less than a contract—must fall before the clear evidence of the fraud by which it. was established. This principle can never be departed from without making the law the instrument for the perpetration of injustice, oppression of crime. This is familiar law." Yorke v. Yorke, 3 N. D. 343, 55 N. W. 1095.

"Equity will restrain the enforcement of a judgment which was unjustly obtained by means of a conspiracy or fraudulent collusion." 23 Cyc. 1027.

"The district court, being a court of general jurisdiction, can, in a case of equity, where fraud and collusion are charged against a judge in entering an order or decree, review the same and annul it, if the facts justify such a conclusion." Sanford v. Head & Merrit, 5 Cal. 297; Stokes v. Knarr, 11 Wis. 392.

*Lawrence & Murphy* and *Edward Engerud,* for respondent.

"No inquiry can be made into the honesty of the decision of a court when that decision is interposed as conclusive evidence of probable cause. Root v. Rose, 6 N. D. 575.

"The peace and interests of society require the power to disturb the decrees and judgments of courts of competent jurisdiction, and to reopen controversies which it is the policy of the law to quiet, to be exercised with strictness and caution. Waldron v. Waldron, 76 Ala. 285; United States v. Throckmorton, 98 U. S. 61, 25 L. ed. 93; Graves v. Graves, 10 L.R.A.(N.S.) 226; 15 R. C. L. pp. 875, 876, 878.

"A charge of fraud in obtaining a judgment of divorce must, in

order to sustain a bill in equity to set it aside, be established by the clearest and most satisfactory evidence." Whittaker v. Whittaker, 151 Ill. 266, 37 N. E. 1077; Whiting v. Whiting, 114 Mass. 494; Holbrook v. Holbrook, 114 Mass. 568; Watkinson v. Watkinson, 68 N. J. Eq. 632, 69 L.R.A. 397, 60 Atl. 931, 6 Ann. Cas. 326; Wiemer v. Wiemer, 21 N. D. 371, 130 N. W. 1015.

"A burden rests upon whoever seeks to set aside a judgment or decree, of proving facts and establishing grounds sufficient to warrant the court in annulling it." Waldron v. Waldron, 76 Ala. 285; Corney v. Corney, 108 Ark. 415, 159 S. W. 20; Re James, 99 Cal. 374, 37 Am. St. Rep. 60, 35 Pac. 1122; Penn v. McGhee, 6 Ga. App. 631, 65 S. E. 686; Van Sickle v. Harmeyer, 172 Ill. App. 218; Ellis v. Ellis, 61 Iowa, 644, 17 N. W. 28.

Robinson, J. This is an appeal from an order made by Judge Cooley refusing to vacate a judgment of divorce. It was duly given twelve years ago, and under it the defendant has been receiving $300 a month, so she has now received about $40,000 under the judgment she seeks to vacate. She appealed from the judgment and the appeal was dismissed, not on any technicality, but on a showing that she had then received a large sum of money under the judgment. Tuttle v. Tuttle, 19 N. D. 748, 124 N. W. 429. The decision of this court is signed by Justices B. F. Spalding, C. J. Fisk, John Carmody, and D. E. Morgan. The last two justices are now dead. Judge Winchester, who gave the decision, is dead. Several of the distinguished attorneys who took part in the trial are dead. The death roll includes Mr. Cochrane, who was attorney for defendant; and, on very dubious affidavits imputing bribery to attorney Cochrane and the late Judge Winchester, the defendant moves to vacate the judgment. If the motion were to prevail, then, in twelve years hence, when some of the present judges may be no more, there might be a similar motion to vacate any decision by this present court.

In November, 1907, nearly thirteen years ago, when the plaintiff was fifty-nine and the defendant sixty-three years, this action was commenced. From the complaint and the answer it appears that each party charged the other with cruelty and desertion. On the trial of this

46 N. D.—6.

suit both parties were represented by distinguished counsel and both parties were present and testified. In all, sixteen witnesses testified. The testimony taken before Judge Winchester covers 356 typewritten pages, the depositions, 165 pages, and then there are numerous exhibits. To attempt a statement of the testimony would be an act of folly. Judge Cooley has found that the judgment is well sustained by the evidence, and the writer is well satisfied that the decision of Judge Winchester is in accordance with the testimony and that it is in all respects just and righteous.

The motion is based on several dubious affidavits imputing bribery to Judge Winchester, and attorney Cochrane. If the judgment was wrong and contrary to the evidence, the remedy of the plaintiff was by an appeal within a year, and not by a motion after the lapse of twelve years and after receiving $40,000 on the judgment. The motion is based on affidavits written by counsel, subscribed and sworn to by the affiants. Such affidavits are the weakest kind of evidence. They have little or no force when they relate to transactions long past, to transactions with deceased persons, or to matters not susceptible of proof to the contrary.

The principal affidavit is made by Mr. Pettibone. It avers that pending the suit on different occasions Tuttle stated that it was his intention to bribe W. F. Cochrane, one of defendant's attorneys; that Tuttle showed him (Mr. Pettibone) a roll of currency, $1,500, which he said he was going to give Judge Winchester for campaign purposes. The affidavit avers that Pettibone saw Tuttle enter the judge's chambers and there remain with the judge for half an hour; that Tuttle stated to him that he had delivered the roll to the judge; that W. F. Cochrane said to Pettibone that Tuttle should have given him $10,000 for his action in the divorce suit. The conclusion of the affidavit is that affiant is not in any manner interested in the suit, but desires to see justice done. To give credit to the affiant we must conclude that the desire to see justice done was very tardy and that Judge Winchester, attorney Cochrane and Mr. Tuttle were fools as well as knaves.

Mrs. Tuttle makes several affidavits. She avers that she did not know of the bribery until January, 1919, when it was disclosed to her by Mr. Pettibone.

Knappen, editor of a newspaper, makes affidavit in regard to con-

versations with Tuttle concerning the divorce matter in 1908 and 1919. In this busy world, ten or twelve years is a long time to remember casual remarks such as commonly "pass in at one ear and out at the other." Who can remember even the text from which his pastor preached ten years ago?

George Hogue makes affidavit that in October, 1908, Tuttle tried to hire him to bribe Cochrane by offering him $10,000 to arrange the record so that in case of an appeal Tuttle would be sure to win. And that during 1908, he, George Hogue, took a prominent part assisting Tuttle in his campaign for election to the House of Representatives. How strange that a man of truth and honor should work to secure the election of a man confessedly guilty of bribery and corruption!

There is no good reason for extending the opinion by a discussion of the moving affidavits. They are all alike; they are all controverted; they are all dubious and highly improbable, and if true, the facts stated do not show cause for vacating a regular judgment after such a lapse of time and after defendant has for so many years accepted the benefits of the judgment.

It is shown that in January, 1918, defendant commenced an action against the plaintiff in the district court of Burleigh county to recover about $480,000 ($300,000, with interest from January, 1909). The basis of the action is that in the divorce suit she should have recovered at least $300,000. Such an action, in the opinion of the writer, taken in connection with the proceedings in this case, gives to the whole a color of blackmail. It shows an attempt to extort money from the plaintiff, to force him to buy his peace by harassing him with vexatious, groundless, and expensive litigation. The judgment in the case was given after a full and fair hearing. It imports absolute validity and verity. It is not subject to a collateral attack, nor is the plaintiff subject to a suit for obtaining the judgment. Hence, no party has a right to commence or prosecute such an action.

The order appealed from is affirmed, with costs.

CHRISTIANSON, Ch. J., and BIRDZELL, J., concur.

BRONSON, J. I concur in the affirmance of the order of the trial court. In the other opinions filed the facts are quite fully stated. The

crux of the controversy is the sufficiency of the moving papers, in equity, to warrant the vacation of the judgment of divorce that has stood unimpeached for over ten years, and through which the moving party has continuously accepted benefits both before and after the discovery of the alleged fraud and bribery. It is evident that the trial judge, the Honorable Charles M. Cooley, gave careful and considerate attention to plaintiff's claims. He has rendered a well-prepared and well-considered memorandum decision. Therein he has stated that the presumptions are in favor of the correctness of the decree attacked, and of the honor and integrity of the court which rendered the decree; that charges of this character must be established by clear and satisfactory evidence (citing Garrison v. Akin, 2 Barb. 25; Wiemer v. Wiemer, 21 N. D. 371, 130 N. W. 1016); that the evidence, submitted in the form of affidavits, is of an unsatisfactory character and insufficient to warrant the vacation of the decree through a motion made upon such affidavits alone; that, upon principles of estoppel, the plaintiff, through the acceptance of benefits under the decree both before and after the discovery of the alleged fraud and bribery, in sums of money aggregating over $36,000 is not in a position now, after the lapse of over ten years since the rendition of the decree to question the decree; and, further, that the decree of divorce, so questioned, is sustained by the evidence produced at the trial where both parties were present, and where both parties submitted evidence and the case for the decision of such trial court. We quite agree with the decision and findings of the trial court. Manifestly, plaintiff's affidavits, procured ex parte, not subject to cross-examination, show largely merely circumstantial conditions. Largely, they are in the nature of hearsay statements. The innuendo and the insinuation may be strong, but the asserted proof of the acts of fraud or of the corruption of the court is very weak and unsatisfactory. Assuredly the solemnity of a decree thus rendered and now hoary with age, and the integrity of the trial judge, long since deceased, whose lips may not now utter to mortal ears any defense of his judicial acts, may not thus be impeached.

CHRISTIANSON, Ch. J., and BIRDZELL, J., concur.

GRACE, J. (dissenting). On February 9. 1909, the plaintiff pro

oured a decree of divorce from the defendant, and in that case findings of fact, conclusions of law, and order for judgment were made and the decree of divorce granted.

This motion is dated April 17, 1919, and was served upon the plaintiff in due time and manner, and was heard on the 25th day of September, 1919, and the order made from which appeal is taken.

The grounds upon which it is sought to set aside the decree are fraud and bribery by the plaintiff in procuring it. The affidavits in support of the motion are those of defendant, Pettibone, Knapper, Christopher and Hogue. The affidavit of one L. C. Pettibone is as follows:

State of North Dakota, ⎞ ss.
County of Stutsman. ⎠

"L. C. Pettibone, being first duly sworn, upon his oath deposes and says that he is a citizen of the United States and a resident at Dawson in Kidder county, North Dakota, and has been for more than twenty years last past; and that during said time he has been and now is engaged in a general real estate business. That he has known Wm. P. Tuttle, the above-named plaintiff for about twenty years last past and since the year 1905 has been intimately acquainted with him. That he also is acquainted with Louise J. Tuttle and has been for some years last past prior to 1909. That from the year 1905 up and inclusive of a portion of the year 1914 he was associated in various business transactions with the plaintiff above named, and, together with said Tuttle, in Dawson and Bismarck, occupied the same office. That during the years 1905 up and inclusive of the year 1913, this affiant was familiar with the business transactions of the said Tuttle and of the various matters concerning which the plaintiff, Wm. P. Tuttle, was involved financially, and knows said Tuttle did not pay out money in October, 1908, to exceed $1,000 in business matters. That during said years the said Wm. P. Tuttle had and maintained bank accounts in various banks in different states, including Chicago, Illinois, St. Paul, Minnesota, Dawson and Steele, North Dakota. That affiant was familiar with the institution, the progress of the trial and the final determination of the above-entitled action, which was an action in divorce and knows of his personal knowledge that the same was tried before W. H. Winchester, in the district court of Burleigh county, beginning on or

about December 8, 1908. That during the months intervening between January 1, 1908, and December 1, 1908, the said Wm. P. Tuttle, upon various occasions stated to this affiant that it was his intention to bribe said judge of the district court above named to decide the case in his favor and between said dates, the said Wm. P. Tuttle stated to this affiant upon different occasions, that it was his intention to bribe W. F. Cochrane, one of the defendant's attorneys, with the same purpose in view; and during said times the said Tuttle requested the said affiant to interview the said Cochrane and to promise him anything to induce him in plaintiff's favor in said case, which affiant declined to do.

"Affiant further states that during the month of October, 1908, he accompanied the said Wm. P. Tuttle to Burleigh county courthouse in Bismarck, North Dakota, and entered the main court room of said courthouse. That at said time a number of other people were present on some matters then pending before Judge Winchester. Affiant and Wm. P. Tuttle sat in the main court room waiting until the other people had dispersed. That just previous to taking the said trip to the courthouse with said Tuttle, at a room at the hotel in Bismarck, said Tuttle had exhibited to affiant a yellow envelope containing a large amount of currency, which he said amounted to $1,500; that he, Tuttle, said he was going to deliver said money to Judge Winchester for campaign expenses, that while they were alone in said courthouse and before entering the presence of Judge Winchester, the said Tuttle again exhibited to affiant the yellow envelope requesting him, the affiant, to deliver it to the judge and to advise him that it was for campaign expenses; that said affiant absolutely refused and declined to have anything to do with the matter; that plaintiff, Wm. P. Tuttle, then entered the chambers alone and there remained for from one half to three quarters of an hour, with Judge Winchester, whereupon he, Wm. P. Tuttle, joined this affiant in said court room; that affiant did not again see said yellow envelope or its contents after the said Tuttle emerged from the room where he interviewed said Judge Winchester; that immediately thereafter the said Tuttle stated to this affiant that he had delivered said $1,500 to Judge Winchester, and that during the interview and at the time said money was so delivered by him, he had discussed thoroughly the above-entitled pending action, with the judge, and stated to affiant also that he had delivered said $1,500 to Judge

Winchester and the judge had accepted the same, with the remark to affiant that the judge seemed glad to get it.

"Affiant further states that the said Tuttle stated that the judge had then promised in the course of the trial to censure Wm. J. Tuttle, a son of plaintiff and defendant, if said Wm. J. Tuttle should take the witness stand in said case in behalf of his mother. The said Tuttle further stated to this affiant after said October, 1908, and prior to the date of trial in said case, that it was agreed between the plaintiff and the judge as to the amount of alimony that the judge should determine that the plaintiff should pay to the defendant, and it was further stated to the affiant by Wm. P. Tuttle that the judge asserted that it should be the sum of $300 per month rather than the sum of $150, which the plaintiff himself stated to affiant he had suggested; that the judge gave for his reason that in case there should be an appeal, that the supreme court might think that the sum of $150 would be inadequate; all of which statements were made prior to the date of trial of said action.

"Affiant further states that after trial and determination of said action before said Judge Winchester, the said Tuttle stated to this affiant on or about January, 1909, that he, Tuttle, was to give Judge Winchester a trip to Mexico at Tuttle's expense, and stated further to affiant that he, Tuttle, was to arrange for said trip for said Judge Winchester through some tourist association in Chicago, Illinois.

"Affiant further states that some time after the trial of said action he had a conversation with W. F. Cochrane, formerly of Bismarck, and the identical man that appeared as one of the attorneys for Louis J. Tuttle, and that said Cochrane stated to this affiant that Tuttle should have given him at least $10,000 for Cochrane's action in connection with said case in behalf of said Tuttle.

"Affiant further states that he was present at the trial of said action and according to affiant's best recollection on the evening of December 11, 1908, at the close of the taking of testimony in said action he heard Judge Winchester severely censure Wm. J. Tuttle, heretofore mentioned, which language so used by the trial judge at said time corresponed with what the plaintiff, Wm. P. Tuttle, had before the trial stated to this affiant would be used by said judge upon the trial.

"Affiant further states that from the close of the trial of the said

action in December, 1908, he had not seen Mrs. Wm. P. Tuttle for a period of about ten years and until on or about the 28th of January, 1919, at which time this affiant disclosed to said defendant, Louise J. Tuttle, substantial evidence of the things in this affidavit set forth, and prior to that time he had never disclosed to said Louise J. Tuttle or Wm. J. Tuttle, her son, or defendant's attorneys, any of the things hereinbefore stated.

"Affiant further states that he is not in any manner related to said Louise J. Tuttle or to the plaintiff, Wm. P. Tuttle, and has no interest whatever in this case save that he desires to see justice done.

"L. C. Pettibone.

"Subscribed and sworn to before me this 10th day of April, A. D. 1919.

"Jay M. Allen,
"Notary Public, Stutsman Co., N. Dak.,
"My commission expires March 25, 1921."

Other affidavits, showing, or tending to show, fraud and bribery, are those of H. P. Knappen, Aaron Christopher, and George M. Hogue, and in the order named are as follows:

State of North Dakota,⎱ ss.
County of Burleigh.  ⎰

"H. P. Knappen being duly sworn says he is a married man and now is and for many years has been a resident of the city of Bismarck, North Dakota, and for many years and now is an editor and manager of a newspaper published in Bismarck. That he has known Wm. P. Tuttle since the year 1906 or 1907, but does not know the defendant, Louise J. Tuttle; that he knows of his own knowledge of the above action and that it was an action for divorce, and that he remembers well the commencement of the action and the trial thereof as well as the decision made by the judge before whom said action was tried; that he remembers said Wm. J. Tuttle talking many times to affiant both before and after the trial of the case, said conversations taking place at Bismarck, North Dakota, with exception of one talk which took place at Steele, North Dakota; that affiant was much impressed by the extreme hatred of said Tuttle toward his wife and his son Wm. J. Tuttle, as evidenced by the language used by said Tuttle to affiant,

said language being so unnatural that it raised a question in affiant's mind of said Tuttle's normal mentality; that said Tuttle on several occasions during October and November, 1908, and later and in early February or March, 1909, requested affiant to publish in his newspaper matters derogatory to the defendant, Louise J. Tuttle, and before said case was tried informed this affiant that he had it arranged with the court that he should be granted a divorce from his (Tuttle's) wife and knew that he would only have to pay such alimony as he (Tuttle) would voluntarily pay, and told this affiant that he had contributed large sums of money to the campaign fund of the trial judge who was a candidate for the office at the 1908 election, and that the trial of the case would not take place until after said election had occurred, and that the judge had agreed to decide the case in his (Tuttle's) favor and to deny the wife any relief that she was asking for, and during one of said conversations stated to affiant that W. F. Cochrane, one of the defendant's attorneys, had for a consideration, which Tuttle stated he had promised, consented to aid the plaintiff in his efforts to obtain his divorce, and had agreed with the plaintiff not to appeal the case to the supreme court after the trial judge should announce his decision in the plaintiff's favor.

"Affiant well recalls said Tuttle coming to affiant's newspaper office sometime in early March, 1909, to affiant's best recollection, and stating in substance and effect that 'the trial judge had carried out the agreement entered into between himself (Tuttle) and the judge previous to the trial and stating that he (Tuttle) was entitled to the decision as he had paid the court to give it,' and at the same time requesting affiant to publish in his newspaper a write-up of the case that would severely censure the defendant, Mrs. Louise J. Tuttle.

"Affiant further states that the language of said Tuttle at that time shocked affiant and disgusted him, and, not believing then the statements of Tuttle concerning the court or the defendant's attorney, but nevertheless somewhat surprised at the decision, refused to publish the article submitted. .

"H. P. Knappen.

"Subscribed and sworn to before me this 1st day of August, 1919.

"John F. Fort,

"Notary Public, North Dakota,

"My commission expires Dec. 12, 1922."

State of Minnesota, ⎱ ss.
County of Hennepin. ⎰

"Aaron Christopher, being first duly sworn says he at present resides in the city of Minneapolis, Minnesota, and his business is that of hotel clerk, in Hotel Dyckman, in said city; that for many years and until recent months he was resident of Bismarck, North Dakota, and for years was hotel clerk in the Northwest Hotel and also the McKenzie Hotel at Bismarck, North Dakota; that he is well acquainted with Wm. P. Tuttle, the plaintiff in this action, and has known him since about the year 1907; that he well remembers the above-entitled action and knows that it is an action for divorce and well recalls the time said action was pending and the time that the same was decided; that while he was clerk at the Northwest Hotel and during the year 1908, the said Wm. P. Tuttle during that year and the year 1909 was a guest very frequently in said hotel and the affiant at that time was very well acquainted with the said Wm. P. Tuttle and had many conversations with him. Affiant well recalls that upon different occasions the said Wm. P. Tuttle showed great hatred and animosity toward his wife, the defendant, and also toward his son, W. J. Tuttle; affiant further states that he remembers that upon one occasion about the month of January, 1909, when the said Wm. P. Tuttle in a conversation in the presence of this affiant stated that he had 'put it all over' his wife in the divorce suit and told the affiant that the defendant, Louise J. Tuttle, never had a chance in said suit and that he, himself, had dictated the granting of the divorce to himself and also fixed the alimony that he was to pay the defendant in said suit.

"He stated to the affiant at said time that he had contributed various sums of money to the campaign expense fund that preceding year, of the judge who tried said case and that he, Tuttle, knew in advance just what the decision would be, as before the trial of the case the judge had agreed with him, Tuttle. Said Tuttle further stated in said conversation that he felt that he was entitled to the decision in view of the fact that he figured he had paid well to obtain it. Further affiant saith not.

"Aaron Christopher.

"Subscribed and sworn to before me this 5th day of September, 1919.
        "Jessie M. Sullivan,
"Notary Public, Hennepin Co., Minnesota,
"My commission expires April 10, 1923."

State of North Dakota, } ss.
County of Burleigh.

"George M. Hogue, being first duly sworn, says that he is a resident
of Kidder county, North Dakota, for more than twenty years past;
that for many years at Steele in Kidder county, North Dakota, he has
been and now is engaged in the farm loan business and is the secretary
of the State Game Commission Board of North Dakota.  That he is
well acquainted with Wm. P. Tuttle above named and has been since
about the year 1905, and that he was intimately associated with him
during the year 1907, 1908, and 1909, during which time the said Wm.
P. Tuttle made his residence at Dawson, North Dakota, living in a
house owned by the said Wm. P. Tuttle, and occupied by the family of
L. C. Rhoades, and said home in said family has been the residence of
said Wm. P. Tuttle since the year 1905.  Affiant further states that he
was familiar with the above-entitled action which was an action for
divorce, and that he was made familiar with all the steps in said action
before and up to the conclusion of trial thereof, as such facts concern-
ing said case were given to him by the said Wm. P. Tuttle.  Affiant
further states that he is not acquainted with Louise J. Tuttle and does
not know her, excepting as he has been informed concerning her by the
said Wm. P. Tuttle.  That while said action was pending in said court,
and before the trial thereof and at the Northwest Hotel of Bismarck,
North Dakota, and during the month of October, 1908, the said Wm.
P. Tuttle, approached this affiant, and stated to this affiant that one,
W. F. Cochrane, was the attorney for his wife, Louise J. Tuttle, and
that it was necessary for said Tuttle to adopt methods which would in-
duce the said Cochrane to act with the said Tuttle as against his wife
in the conduct of said case, at that time the said Wm. P. Tuttle stating
to affiant that the said case would soon be called for trial, and the said
Wm. P. Tuttle stating to affiant that he wished him (affiant) to inter-
view the said Cochrane concerning said divorce case, and to make known
said Tuttle's wishes to him, the said Cochrane, at the same time in-

structing this affiant to promise the said Cochrane ten thousand dollars, ($10,000) if he would arrange the record in the case, so that it could be won on appeal to the supreme court, after the judge of the district court had decided the case in Tuttle's favor, the said Tuttle at the said time stating to this affiant that he had already fixed it with the trial judge of said court to decide said case in his (Tuttle's) favor, and that he had made arrangements with the judge concerning the alimony, which he (Tuttle) should pay to his wife, and had made arrangements as to just what the decision would be, and stating further that the judge had agreed to decide the case in his (Tuttle's) favor. Said Tuttle stating at the same time to this affiant that if he (affiant) could make arrangements with said Cochrane that there would be at least five hundred dollars ($500) in it for this affiant. Affiant further states that he declined to interview said Cochrane concerning the subject-matter, that had been stated to him by said Tuttle. Affiant further states that during the year 1908, he, the said affiant, took a prominent part and assisted the said Tuttle in his campaign to his election to the House of Representatives of North Dakota from the county of Kidder, and that during the said campaign, the said Tuttle many times stated to this affiant that he had contributed large sums of money toward the campaign expenses in the election for said judge, and sometime later, in October, or early in November, 1908, the said Tuttle stated to this affiant that just previous to that time, he had given to said trial judge fifteen hundred dollars ($1,500), and that he had promised said judge, free of expense to the judge, a trip to Mexico during the then coming winter.

"Affiant further states that during the month of January, 1909, he was in Bismarck, North Dakota, a great portion of the time in consultation with the said Wm. P. Tuttle, concerning an election contest which the said Tuttle had with one John Story over said Tuttle in the house of representatives of North Dakota and that during said month of January or early in February, 1909, the said Tuttle stated to this affiant, that the judge of the district court had decided the divorce case and that he had decided in favor of him (Tuttle), and that the judge had carried out his agreement that he had made concerning said case, prior to the trial thereof. Said Tuttle further stating to this affiant that it had cost him a great deal of money to get that decision, but

that he was glad that the court had carried out his agreement with him, and stating that he (Tuttle), thought the decision was worth the money, that he had paid for it. Said Tuttle further stating to affiant upon this occasion that between the month of October, 1908, and the month of March, 1909, that he thought the judge was a little severe in making him pay three hundred dollars ($300) a month for the support of his wife, because the judge had stated to him (Tuttle) in 1908, that he thought perhaps one hundred and fifty dollars ($150) a month would be all right, but later, in December, had changed his mind and insisted upon the said Tuttle paying three hundred dollars ($300) a month, the said Tuttle stating to affiant that it would be better for him (Tuttle) to make it $300 a month, because if the case got into the supreme court, said supreme court might consider one hundred and fifty dollars a month too small an allowance. Later and some time after, as affiant recalls, and in March, 1909, the said Tuttle stated to this affiant that the trial judge had started on his trip to Mexico, and told affiant that he (Tuttle) had paid the expenses of such trip of the judge, and that he had procured the transportation through a tourists' traveling agency in Chicago, Illinois, with which he, said Tuttle, was financially connected. Affiant further stated that he never disclosed the information herein to said Louise J. Tuttle or to any other person, prior to the time that this motion was made to set aside the divorce decree.

"Further affiant saith not.

"Geo. M. Hogue.

"Subscribed and sworn to before me this 20th day of Sept. 1919.
        "John F. Fort,
"Notary Public, Burleigh Co., N. D.
"My commission expires Dec. 12, 1922."

The affidavit of Wm. P. Tuttle denies that he bribed the trial judge in the divorce action, or paid him any moneys whatever to secure a favorable decision therein, and denies the occurrences set forth and alleged in the moving affidavits; and denies that the judge received any money from the affiant for the purpose of influencing his official action.

He maintains further in the affidavit, that the action resulting in a decree of divorce granted him, was fully and fairly tried upon its merits, with all parties present in court, testifying, and that the deci-

sion was made upon the merits and upon the testimony solely, and that the same was justified and fully sustained by the testimony; and was solely upon the evidence, and that the evidence submitted in the cause was not only sufficient to justify the decree in his favor, but was overwhelming in his favor, and that it was established by creditable, competent, and abundant proof; that the plaintiff was entitled to the decree, and that the defendant was not entitled to any relief.

The affidavit further sets forth that while under the laws of the state of North Dakota, then existing, he was not required to pay the defendant any alimony; that he voluntarily agreed to and willingly consented that he be bound to pay her the sum of $300 per month, during the balance of her life.

The affidavit further sets forth that he has paid that sum from the time of the decree and ever since, including the time, or times, subsequent to the service of the motion papers in the present proceeding.

The affidavit further sets forth that application is made by the defendant for the purpose of endeavoring to secure money or property from him, and further sets forth that this application or proceeding was made at the instigation of L. C. Pettibone, for the express and specific purpose of exercising his malice against the plaintiff; and to compel the plaintiff to pay money to Pettibone, upon false and unfounded claims now pending in various courts, brought by L. C. Pettibone against plaintiff and describes such actions.

It was further set forth in his affidavit that the judgment and decree have been effective for a period of more than ten years, and that neither L. C. Pettibone or any other person, during said time, ever claimed or charged any of the facts set out in the application.

Joseph Simons, in this proceeding, made an affidavit in behalf of the plaintiff, which is to the effect that the divorce action was instituted in good faith, for the purpose of having the claims therefore set forth tried upon their merits. States that he assisted in procuring witnesses, and was present at that trial, and that the plaintiff at no time gave any evidence, but that the action was to be tried upon its merits, and to be governed and decided upon the evidence submitted.

The affidavit further sets forth the statement affirming the good character and honor and integrity of the plaintiff, and shows that he was the agent and broker of the plaintiff, was a member of the Chicago

Board of Trade, and that, as such agent, he made to defendant for the plaintiff, the payments of alimony, monthly; and further states that, on the 21st day of April, 1919, he paid $300 to Louise J. Tuttle, the defendant, which payment had been personally solicited, over the telephone, by her from him, and the payment was made on the 22d day of April, 1919, which is exhibit "A;" and that the receipt of the same, by her, was just prior to the service of the papers in this proceeding, upon Wm. P. Tuttle.

There are other counteraffidavits referring to different matters, but we think, it is not necessary to make further reference to them.

The affidavits of Louise J. Tuttle, the defendant, state that no substantial evidence of corrupt conduct on the part of plaintiff, or of collusion between him and Judge Winchester, or with any of her attorneys, in the procurement of the decree, has come to the notice or knowledge of the affiant, at any time since the trial of the action, until January 28, 1919, when Mr. Lee Pettibone, of Dawson, North Dakota, stated to her that he knew of reputable persons who would furnish evidence that prior to said trial Judge Winchester had received and taken from plaintiff a large sum of money.

Her affidavit then sets forth the steps she has since taken to bring the matter to the attention of the court of the sixth judicial district.

She further sets forth in her affidavit that the statement made by Wm. P. Tuttle, in his affidavit, that the proceedings to set aside the judgment is made at the instigation of L. C. Pettibone, is an absolute falsehood, and she further states that it was with the utmost difficulty that she secured the information concerning the facts which she suspected existed for years, but that she had no substantial evidence or knowledge concerning the existence of such state of facts, until she met Mr. Pettibone in Chicago at the time above stated; and that it was only after much difficulty that she induced him to divulge even the most meager details concerning the information which she complained of in connection with said divorce, and that all of her facts which she has procured in support of her motion was done at her own instigation, and upon her own research, through herself and her attorneys; and that she makes, and has made, the application in good faith, and only because she knows that her husband had no grounds for divorce against her, and bringing to the attention of the court the scandalous and fraudulent actions, on the part of her husband, in procuring the divorce.

Pettibone, in a counteraffidavit to that of Wm. P. Tuttle, states that the statement contained in Tuttle's affidavit "that he believes, and has reason to believe, that this application is made at the instigation of one L. C. Pettibone, for the express and specific purpose of exercising the malice of the said L. C. Pettibone against this affiant, and to cause him pain and suffering, when it is used as a means to require the said affiant to pay money to the said L. C. Pettibone upon false and unfounded claims now pending in various courts, wherein the said L. C. Pettibone has brought suit against this affiant," is absolutely false and was known to be false by Tuttle when he made such statement in said affidavit.

It is contended that the proceeding, by motion, to set aside and vacate the decree is not the proper one; that, instead thereof, the defendant should have brought an action to set it aside, and this was the holding of the trial court. In this, we think it was wholly mistaken; and that this proceeding, by motion, is proper and the one practically in universal use in seeking the relief sought to be obtained in this proceeding. Beach v. Beach, 6 Dak. 371, 40 N. W. 701; Freeman v. Wood, 11 N. D. 1, 88 N. W. 721; Simensen v. Simensen, 13 N. D. 310, 100 N. W. 708. This matter needs no further discussion; it is a settled practice in this state.

We come now to the principal question presented in this case, viz: Was the decree of divorce procured by the plaintiff by fraud and bribery? The affidavits supporting defendant's motion clearly and unquestionably show that it was. Those affidavits are practically undenied, excepting by the plaintiff. They contained affirmative evidence of fraud and bribery, which is clear and convincing, and, as against this, there is nothing but the negative of the defendant, which largely is a mere bare denial.

As appeared upon the argument of the matter before this court, the men who have made those affidavits are reputable citizens of this, or near this, immediate vicinity. One of them viz., Hogue, is a member of the state game board. Their affidavits were made in a judicial proceeding, and were subscribed and sworn to by each of them. It cannot be imagined or assumed, that they would, in their affidavits, set forth the acts, conversations, and declarations of the plaintiff, as described by them, which clearly show the commission of fraud and bribery in the procuring of the decree, and deliberately swear to the truth of the same, unless the same were, in fact, true.

It would seem that such affiants, being men of intelligence, would not deliberately swear falsely to such a state of facts, realizing, as they must have, the gravity of the situation in which they placed themselves.

We feel that their statements are so clear and conclusive, with reference to the fraud and bribery committed in obtaining the decree of divorce, as more fully appears from the affidavits, that they must be taken and considered in this proceeding to be true.

There are other circumstances which indicate and prove the verity of those statements. The evidence given by plaintiff in the former case shows that at the time of the granting of the divorce, he had means and property approximately of the value of $350,000 or more. The defendant in her answer claimed the plaintiff had property and means of the value of about $1,000,000. Whatever the evidence and the claims of the parties may show, it is certain he was a very wealthy man.

The only cause claimed by him as a ground of divorce was cruel and inhuman treatment, consisting, in short, of the alleged nagging disposition of his wife, and charges of infidelity by her against him.

We think his testimony and that of his witnesses, as to the alleged nagging disposition of his wife, and her alleged charges against him, of seeking the society of, and consorting with, other women, falls flat when all the facts and the plaintiff's motive and conduct is honestly and conscientiously scrutinized, as disclosed by the evidence.

The evidence conclusively shows that the plaintiff went about considerably with one Stella Miles; that upon many occasions he took her riding in various conveyances; that he gave her valuable presents. He admits that he gave her some presents.

All the circumstances of this character, which are shown by the evidence, were such as would not only arouse suspicion, but the resentment of any decent or virtuous woman.

The defendant knew that plaintiff was improperly conducting himself with some woman on the west side of Chicago, but she did not learn just who the party was until near the time the divorce proceeding was commenced.

If the defendant, in these circumstances, reprimanded, or, as the term is used, nagged the plaintiff in regard to his conduct, it was for the purpose—and we think the evidence so shows—of dissuading him from his unnatural and unbecoming conduct. All that she did in this

46 N. D.—7.

regard was proper and justified, and meant for his welfare and benefit.

Again, his continued refusal to cohabit with her, his cold and clammy treatment of her, in fact, his entire conduct, as disclosed by the evidence, is sufficient to show that he was the one wholly at fault, for, as the evidence indisputably shows from the testimony of the acquaintances of the defendant, who had known her well and intimately, she was a woman of refinement and culture, and of a splendid and lovable disposition, a woman who kept and maintained her home in comfort for the plaintiff. In all the testimony that is adduced, there is not one syllable which in any manner reflects upon her good name, character, and splendid womanly qualities.

The burden of plaintiff's charge is that she had a bad temper and a nagging disposition. He testified, however, that her temper was never anything but the smoothest when there was a third person present; that he had known times when they were both at outs and someone would come and she could be as pleasant as if nothing ever happened, while he could not and got the reputation, with the visitor, of being a grouch.

There is ample testimony to show her disposition was good, and that she did not have a bad temper. The only conclusion that can be drawn from all the evidence in the case is, that the plaintiff tired of the defendant, and took the means which he did to get rid of her; and this, after years of struggle and work together to build up a large community property; and though the defendant is a woman of unquestioned character and virtue, and one whose character is unimpeachable; and though the property was of the value of from $350,000 to $1,000,000, and though she had been accustomed to live as one in their circumstances was justified, the plaintiff and the court, at her advanced age of more than sixty years, turned her out upon the world, practically penniless, except for the pittance which the plaintiff claims, out of his generosity, he offered to give her, to wit, $300 a month, and would not have given her this, but a much smaller sum, except he was fearful on appeal that a smaller sum would not be looked upon with favor.

Not a penny of the community property was allowed her. These circumstances, in connection with the other evidence now before this court, is sufficient to label the whole divorce proceeding as one conceived in iniquity by plaintiff, and carried out by fraud and corruption, on the part of the plaintiff and the court and W. F. Cochrane, one of her attorneys.

The evidence in the case tends to show that the plaintiff bore considerable enmity towards Wm. J. Tuttle, his only son, his only living child. It further tends to show that, on the occasion of differences between the plaintiff and the son, the mother was inclined to shield or take the part of the son.

Some of the evidence tends to show, that it was the ill feeling, in part, plaintiff bore his son which, to some extent, moved him to bring the divorce proceeding. The inference to be drawn from the testimony, as a whole, is, that he had no further use for his wife, nor his son. The ill feeling as to the son was further manifested, and if the affidavits above are true, the plaintiff procured the court to severely reprimand the son while he gave his testimony, and this, without any apparent cause or reason, so far as the evidence discloses.

As showing the true nature and moral character of the plaintiff, and that defendant's charges of infidelity against him were not without reason and justification, and to show that it was his desire to associate and consort with women other than his wife, that caused him to lose all affection for his own wife and child, and which would appear to be the motive of seeking the divorce, so as to get rid of his wife, with the payment of a mere pittance, his improper actions towards one Virginia Rogers is quite material.

Mr. and Mrs. Rogers lived in Chicago. Virginia Rogers was a stepchild of Mrs. Rogers, and at the time in question was sixteen years of age. The son of Mr. Tuttle was about the same age; and the parents had been acquainted for some six years prior to the time of the event, and the children were associates and acquaintances.

In June, 1896, the plaintiff and his son were living at Chicago Beach Hotel; Mrs. Tuttle was in Europe. The plaintiff at that time came to the home of Mrs. Rogers and invited the stepdaughter to the Chicago Beach Hotel, to take dinner with himself and his son, and to attend a dance at the hotel in the evening. She testified in the trial of this case. She was then about twenty-five years of age. She went to the hotel about 5:30 in the evening, and had supper with plaintiff and his son. About 9:30 she prepared to return to her home. In the parlor of the hotel, before she went up to prepare to return to her home, the plaintiff asked her if she would not like to see some paintings and pictures.

The defendant's brief contains a substantially correct version of this testimony set out in narrative form, and is as follows:

"Then he said I had better be starting, and I went upstairs to put on my wraps where I had left them in his room. I asked where Will was and he (Mr. Tuttle) said he did not know, but it did not make any difference.

"When we reached the apartments where I had left my wraps he went into the room with me and closed the door. I walked over by the window and he pulled me on his lap in the same old way as he always had; but he held me as though I was in a vice and he kissed me, which was very strange, in a way that frightened me; he kissed me a great many times. While still holding be in a vicelike grip he asked me if I liked nice things and to have fine clothes and to travel. During the time that he was talking he was still kissing me and holding me tight. He put his hand under my dress as far as he could. He did not say anything at that time. I tried my best to get away from him and got away as soon as I could and went to the door. When I got there I found the door was locked. He tried to get there before I did and asked me if I wanted the door opened. He unfastened it at the same time but not until after I found it locked. I did not cry out; I was too frightened. I did not have my wrap on at this time. I took it with me over my arm and put on my hat standing in the hall. Mr. Tuttle said nothing more; and after I had my hat and wrap on we started home. He went with me holding my hand all the way over to the street car. He was talking just the way he always did and I was too frightened to say anything about what he had done. I did not say anything at all while in the car. We went straight home and he went with me. When we returned my stepmother was standing on the porch. I did not speak to her or anyone; but ran straight upstairs. I was so nervous and worked up and had stood it as long as I could; and so ran upstairs without saying a word to any one. I did not stop to listen to what Mr. Tuttle said to my stepmother.

"My stepmother came to my room afterward. I had not retired but' was lying on the bed crying, I think, when she came into the room. She knew something had happened, but she did not want papa to know anything about it because she thought he would shoot Mr. Tuttle. I attempted to tell her what had happened that night but she restrained

me. The next morning I told her what had occurred. I told her about it as I have told you here. I did not tell my father about it, because, as I said, I was afraid he would shoot Mr. Tuttle if he knew.

"Up to this time I had thought a great deal of Mr. Tuttle. After this incident I never saw him until the other morning in the court room. I never went to his home after that.

"He did not then, nor has he at any time since, attempted any explanation of what he did to me that night at the hotel. He did not attempt any explanation on the street car that night. He acted as though everything was just as it had always been. He did not ask my reasons for being frightened and never referred to it in any way."

Upon cross-examination, the testimony given by Virginia Rogers was in no material degree changed. Her testimony must be taken as true. There is no testimony to dispute it. The plaintiff does not dispute its truthfulness. The next morning Virginia recited her experience to her mother, who was also present and gave testimony at the trial.

We think, considering all the testimony, with reference to the plaintiff's association and relations with women other than his wife, his conduct in general towards them, and the testimony which shows his nature and natural tendencies in this regard, that there can be no question but what the defendant's excited state of mind, if any, upon the various occasions, together with whatever reprimands she had administered to her husband, were well deserved by him, and were meant for his good and recall from his ways of error, and that there was no cruel and inhuman treatment, by the defendant, of plaintiff, by reason of administering any of such reprimands, nor even by having him watched by detectives, which, in the circumstances of this case, would be ground for divorce. The fact is, under the evidence, plaintiff had no ground for divorce, though we think it clearly appears that the defendant did; that the treatment of defendant, by plaintiff, was cruel and inhuman, there is no doubt, and that is clearly shown by the evidence. It also clearly appears, that plaintiff for several years denied defendant marital rights, and finally that he wholly deserted her.

The conclusion is irresistible from all of the evidence that plaintiff's motive in the divorce suit was to get rid of the presence and association of both his wife and son, against each of whom he seemed to have an enmity which is explainable on no other theory than that he had wholly transferred his affections to others.

In the face of such evidence as this, and the evidence as a whole, and the showing herein made, all presumptions of regularity in the procuring of and of the validity and verity of such judgment are overcome; and the judgment may be shown to be, as this judgment clearly is, a fraudulent and collusive one.

The affidavits above set forth show the fraud of the plaintiff, the court, and W. F. Cochrane, an attorney for the defendant; and that the judgment is the result of such fraud would seem the only reasonable and logical conclusion that can be reached, and one that cannot well be avoided; that the judgment is unconscionable, unjust and inequitable, and fraudulent seems clear; and that if defendant had received a fair trial before an impartial court, and one where the fraudulent practices and schemes above shown were absent, a different result and judgment must have resulted.

In the plaintiff's brief appears the following:

"Suppose that the evidence was such that it clearly established the facts which entitled Mr. Tuttle to a divorce. In that case, the fact that the trial judge had received and accepted a bribe would clearly not be ground for vacating the judgment, because no harm had been done. The judgment was right on the evidence, even though the trial judge was corrupt. On the other hand, if the evidence did not warrant or sustain the decision of the trial court granting a divorce to Mr. Tuttle, but the decision was rendered contrary to the evidence, by the corrupted judge, Mrs. Tuttle had an ample remedy by appeal.

"In a divorce case in North Dakota, the case is tried anew in the supreme court, on the evidence presented to the trial court. Consequently, if Mrs. Tuttle claims that the decision was against the evidence, she was bound to raise that question by appeal. If she did not avail herself of that remedy, but elected to acquiesce in the erroneous decision, by accepting the benefits of the judgment, her mouth is forever closed to say that the judgment was wrong.

"It follows, therefore, that Mrs. Tuttle is between the horns of a dilemma. She cannot complain of the corruption of the trial judge, unless the judgment was wrong. But, if the judgment is wrong, she is estopped to allege error, because she elected to accept the benfits of it, instead of having it reversed on appeal."

From what we have above said, we are fully convinced the judgment

was wrong and contrary to the evidence; and we are further of the opinion that the judgment being a fraudulent one, she did not waive any of her rights, if she failed to appeal. But she did take an appeal and that appeal was taken by Mr. Cochrane, her attorney, who was also, according to the affidavits, a party to the fraud. That appeal was dismissed upon a technicality and was not decided upon the merits. See Tuttle v. Tuttle, 19 N. D. 748, 124 N. W. 429. As we view it, the trial being tainted with fraud, which the plaintiff, according to the affidavits, actively engineered and in which he participated, he is not in a position before a court of equity to plead estoppel, on the ground that the defendant has received benefits under the judgment, and in the circumstances of this case, she is not estopped.

There was, as a matter of law, no trial, if the allegations of the affidavits are true, and in this proceeding they must be presumed to be true. How then could there be any trial? What chance or opportunity was there for the defendant to obtain justice in that trial? The trial was a mere farce, and the judgment a nullity, absolutely void from its inception.

The case of Rykowsky v. Bentz, 45 N. D. 499, 178 N. W. 284, was recently decided by this court. In that case a motion was made by the defendant to vacate the judgment on the ground that it had been taken against him by default, through fraud. It was contended by plaintiff that the relief could not be granted, for the reason that § 7483, Comp. Laws 1913, applied. That section, in effect, provides, that the court may in its discretion and upon such terms as may be just at any time within one year after notice thereof, relieve a party from a judgment, order, or other proceeding taken against him, through his mistake, inadvertence, surprise, or excusable neglect.

In reply to this contention, this court, speaking through Chief Justice Christianson, said: "If the judgment was taken against the defendant, under the circumstances set forth in this affidavit, it was obtained through fraud, and would be subject to attack for that reason. See Shary v. Eszlinger, 45 N. D. 133, 176 N. W. 938. The power to set aside judgments obtained by fraud is not dependent upon § 7483, supra, but is inherent in all courts of record. Black, Judgm. § 321; Williams v. Fairmount School Dist. 21 N. D. 198, 129 N. W. 1027; Whittaker v. Warren, 14 S. D. 611, 86 N. W. 638. Hence, the dis-

trict court had power to vacate the judgment, notwithstanding more than one year had elapsed after the defendant had notice thereof."

In that case, the district court refused to vacate the judgment, but this court held, that, in that, it was in error and reversed its decision, and we think the same should be done in this case.

The plaintiff relies upon the fact that there is some litigation between Pettibone and him, as the inducing cause of this proceeding. In other words, that, through malice, Pettibone has been a prime factor in bringing about this proceeding. We do not think the litigation between Pettibone and plaintiff would be sufficient to cause the former to swear to the affidavit given in this proceeding.

As we view the matter, Pettibone's motive is immaterial; that does not necessarily affect the truth of the statements in his affidavit. If those statements are true, it is immaterial if there are strained relations between the plaintiff and Pettibone. In fact, if their relations are strained, that may be the very cause of exposing the fraud so long covered up.

In many cases of fraud, perhaps, it is just such an incident, or the bringing about of such a condition, that causes the fraud to be brought to light. It is often difficult to discern and uncover fraud. The perpetrators thereof so cover up their fraudulent acts and intentions, that the fraud is not sometimes readily discovered, and, as in this case, unless some event transpires which causes the fraud to become known, discovery is often never made; and, if it is true, there is any strained relations between the plaintiff and Pettibone on account of litigations between them, and that this caused him to tell the defendant, it does not weaken, but strengthens, defendant's position in this proceeding.

It was the event that brought her the first knowledge she ever had of the great fraud perpetrated upon her, as alleged in the affidavits, which wrecked her life, caused an unjust, unconscionable, and unwarranted decree of divorce to be entered against her, and which denied her all interest in the community property, and which locked the courts of justice against her at the trial.

As soon as the defendant knew of the fraud she took immediate action. In fact, the ten years or more which has elapsed before she did take that action is immaterial, so long as she acted promptly after the discovery of the fraud.

The Statute of Limitations against fraud does not commence to run until after the fraud is discovered. She acted with promptness and despatch upon the discovery thereof, and we think she should be given a chance to obtain justice, which has too long been denied her on account of the great fraud committed against her.

Plaintiff has this to say in the brief, towards its close: "The whole proceeding by which a judge is to be branded after his death as bribe taken, a gentleman like Mr. Tuttle, whose honor and integrity have not otherwise been questioned is to be stigmatized as a criminal, and an established judgment is to be overturned and a large sum of money, or the opportunity to get it, is to be afforded this defendant, upon affidavits which contain nothing more than an alleged admission contained within conversations occurring more than ten years prior to the giving of the affidavits."

This is stated, as a reason why relief should not be granted defendant. The answer to this is, that the only real way to prevent dishonor to the names of the parties mentioned is to afford an opportunity to prove that the allegations in the affidavit, made under oath, are not true. If they are true, no name connected with the alleged fraud is entitled to any protection, and whether they are true or not should be determined in a court of justice.

If the plaintiff feels that the charges in the affidavits are false, it would seem he should be the most anxious of all to have the makers of those affidavits examined under oath, in a court of justice.

We think the good faith of defendant is plainly evident and sustained by the affidavits in this proceeding, and the record of the trial. That the judgment has remained unattacked for ten years is of no consequence if the judgment were procured by fraud. If it had stood for twice that period of time, that added nothing to its verity nor validity if, in fact, it was procured through fraud.

The defendant has acted promptly upon the discovery of it, and that is all the law requires of her.

The order appealed from should be reversed, and the case should be remanded to the trial court, with directions to enter an order vacating and setting aside the judgment and decree of divorce under consideration in this proceeding.